2021 IL App (4th) 180761

NO. 4-18-0761

FILED
March 17, 2021
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| GERMAL L. BANTA, | ) | No. 17CF716 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Leslie J. Graves, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justices Cavanagh and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    In July 2017, defendant Germal L. Banta was charged with four drug-related offenses, including manufacture and delivery of a controlled substance, a Class X felony. In March 2018, after a hearing on defendant's motion to suppress evidence, the trial court denied the motion, finding defendant voluntarily consented to the police search of his person.

¶ 2    In August 2018, defendant was convicted of the Class X felony after a stipulated bench trial, and the trial court set the matter for sentencing in October 2018. At that time, defendant was sentenced to nine years in the Illinois Department of Corrections (DOC).

¶ 3    On appeal, defendant argues (1) the trial court erred by denying his motion to suppress because (a) he did not consent to a search of his person by the police and (b) his illegal detention and subsequent frisk vitiated any later consent; (2) the search was unconstitutionally

invasive and exceeded the scope of any implied consent; (3) the trial court's *in camera* viewing of body camera videos admitted during the motion to suppress constitutes second-prong plain error; (4) the evidence was insufficient to find defendant guilty of delivery—rather than possession—of heroin; and (5) the trial court committed plain error at sentencing by (a) considering factors inherent in the offense, (b) refusing to properly consider mitigating evidence, (c) making disparaging remarks about defendant, and (d) giving undue weight to defendant's criminal history in aggravation.

¶ 4                                    I. BACKGROUND

¶ 5         In July 2017, the State charged defendant in a four-count complaint with two counts of manufacture/delivery of a controlled substance, one a Class X felony involving heroin (720 ILCS 570/401(a)(1)(A) (West 2016)) and the other a Class 1 felony involving cocaine (720 ILCS 570/401(c)(2) (West 2016)), and two counts of unlawful possession of a controlled substance (720 ILCS 570/402(a)(1)(A) (West 2016)), one count a Class 1 felony and the other a Class 4 felony.

¶ 6         In November 2017, defendant moved to suppress evidence, claiming, in part, police had no reasonable suspicion to detain and search defendant and the controlled substance found on defendant's person was illegally obtained since police retrieved it from defendant's person without consent and without first procuring a warrant.

¶ 7                          A. Motion to Suppress Hearing

¶ 8         During the March 2018 suppression hearing, the trial court heard testimony from defendant, Illinois State Police Trooper Clayton Chapman, and Springfield police detective Michael Raynolds. The witnesses were in agreement that defendant was a passenger in a car lawfully stopped for speeding on the interstate and the driver did not have a license. While Trooper

Chapman spoke to the driver, another trooper arrived and performed a K-9 dog sniff, alerting to the presence of drugs inside the vehicle. Defendant testified the trooper approached and asked him to step out of the vehicle and allow him to perform a "pat down" for weapons. Defendant stated he consented to the "pat down," after which the trooper ordered him to stand in the grass next to other officers (defendant said "like six or seven") while they searched the vehicle.

¶ 9    Defendant testified the police searched the car "for almost an hour" without finding anything. Nothing was found on the driver of the vehicle, and no testimony regarding the driver's statements, if any, was introduced at the hearing. Defendant recalled Trooper Chapman approached him after searching the vehicle and said, "I want to re-search you again." Defendant said he told Chapman, "No, you already searched me. Was anything found or nothin [*sic*] at all? Can I go?"

¶ 10    He claimed one of the officers pulled his Taser and told him to put his hands up, which he did. Trooper Chapman grabbed defendant's hands behind his head and started sliding his hand up and down between his buttocks "like a credit card." Defendant said he "jumped away from him" and said, "you're feeling on me. This is not a search." He asked for someone other than Trooper Chapman to continue searching him because he claimed Chapman continued to stick his hand up defendant's rectum during the search. Defendant testified that "[t]he officer put me in cuffs" and began walking him as if to put him in the squad car and then placed his feet in front of defendant, causing him to fall down. Officers pulled down defendant's pants and held him down while one of the officers pulled the drugs out of his "rectum."

¶ 11    Trooper Chapman, a 14-year veteran with the Illinois State Police, testified he initially spoke with the driver. He eventually determined neither the driver nor defendant had a valid driver's license. On cross-examination, Chapman acknowledged defendant was never free to

leave prior to the search he and another officer later conducted of defendant. After learning the K-9 alerted on the vehicle, Chapman and the K-9 handler searched the vehicle, finding no contraband. As a result, the decision was made to search the driver and passenger again. Chapman approached defendant to conduct the search. His testimony then proceeded as follows:

"[ASSISTANT STATE'S ATTORNEY]: And did you ask his consent to search his person again?

A. Yes.

Q. And what was his response?

A. He did not tell me no."

When Chapman began searching defendant, he said he felt an object in between defendant's buttocks, which he "believed to be illegal drugs." Chapman testified defendant "reacted to me and believed that I was rubbing him and felt uncomfortable, and didn't want me to search him anymore."

¶ 12    Detective Raynolds, a detective with the Springfield street crimes unit, testified he assisted the Illinois State Police during the traffic stop. Without providing further explanation, he stated he was "assigned to assist DEA and Illinois State Police in locating a vehicle and possibly stopping it." He was standing next to defendant when he saw Trooper Chapman search him. He heard Chapman say he found something and heard defendant ask to have another officer conduct the search. That other officer, Officer Reidy, then continued with the search and said he found something. Defendant was placed in handcuffs, and Detective Raynolds then began searching and felt a "rock-like substance" in defendant's buttocks, which he believed to be narcotics. Detective Raynolds stated he attempted to retrieve the object but defendant "kept moving and clinching his buttocks." After defendant continued to clench his buttocks, police forced

defendant to the ground. Detective Raynolds continued to search defendant, and he pulled the drugs from defendant's buttocks. While defendant was handcuffed, Raynolds testified he heard defendant say "he had a little dope on him." On cross-examination, he confirmed when he arrived, there was no indication defendant had committed any crime, but he agreed with Trooper Chapman that defendant was not free to leave. Raynolds clarified that, contrary to defendant's assertion, the object, which was a baseball-sized plastic Baggie, was not inside defendant's rectum but between his butt cheeks, which is what made it possible for the officers to feel it while conducting the search.

¶ 13    Both parties stipulated to the body camera videos, with defense counsel requesting the court "review it at your leisure after the evidence." The trial court agreed to allow the parties to submit written arguments and continued the case to review the body camera videos and conduct some of its own research before ruling on the motion to suppress.

¶ 14                                B. Body Camera

¶ 15    The body camera video containing the interaction between Trooper Chapman and defendant does not come from Trooper Chapman but from Detective Raynolds. Regrettably, there is no audio on Raynolds's body camera video during this initial encounter to verify if defendant protested the search like he says, or what defendant said.

¶ 16    After defendant exits the car, Trooper Chapman conducts a "pat down" search. Defendant then stands off to the side of the vehicle in a grassy area between two other officers while the troopers search the vehicle. After a search of the vehicle, Trooper Chapman searches the driver and then approaches defendant while two officers stand on either side of him. There is a conversation observed between the two of them, but without audio, there is no record of what was said. As they speak with each other, defendant can be seen making hand gestures. Trooper

Chapman makes a motion appearing to direct or order defendant to turn around. Defendant complies, turns around, and puts his hands behind his back like he is waiting to be handcuffed. The trooper does not place handcuffs on him at this time but begins to search defendant starting with the back of his pants, and defendant puts his hands up. Shortly after Trooper Chapman begins searching defendant, Detective Raynolds walks away, and defendant and Trooper Chapman are no longer in view.

¶ 17    Officer Raynolds then approaches defendant and Trooper Chapman and activates the audio on his body camera. Defendant can be heard protesting the invasiveness of Chapman's search and asks that someone else search him. He is eventually handcuffed, and he continues to protest as he starts to physically struggle with the officers. Eventually he is taken to the ground, and the drugs are extracted from his buttocks by one of the officers.

¶ 18    The trial court entered its order denying defendant's motion to suppress. The court reasoned as follows:

> "That Trooper Chapman had probable cause to stop the vehicle and the temporary detention of the Defendant was lawful due to his consent to search his person.
>
> That the search of the Defendant did not require a warrant, due to the Defendant consenting to the search and there was no physical intrusion into the Defendant's body."

¶ 19    In August 2018, defendant waived a jury trial, and the State and defense counsel proceeded by way of a stipulated bench trial. At the outset of the trial, the State dismissed counts II and IV, proceeding instead on only counts I and III (manufacture/delivery of heroin and possession of heroin). The trial court found defendant guilty of the manufacture/delivery of

heroin (the Class X felony), and the matter was set for sentencing in November 2018. At sentencing, the trial court sentenced defendant to nine years in DOC. Defense counsel did not take issue with the sentence, stating: "We're not appealing the sentence, we're appealing the finding of guilt and the denial of the motion to suppress."

¶ 20        This appeal followed.

¶ 21                              II. ANALYSIS

¶ 22                           A. Voluntary Consent

¶ 23        Defendant's claims of error relating to the suppression motion focus on the lack of evidence of defendant's consent to a search of his person, the effect of an unreasonably prolonged detention on any subsequent consent, and an unconstitutionally invasive search. We see the case being decided on whether defendant provided voluntary consent for police to conduct a warrantless search of his person after a lawful traffic stop. Because the State failed to prove defendant provided either verbal or nonverbal consent for a warrantless search of his person, we reverse the trial court's order denying defendant's motion to suppress.

¶ 24        A bifurcated standard of review is employed when reviewing a trial court's ruling on a motion to suppress. *People v. Holmes*, 2017 IL 120407, ¶ 9, 90 N.E.3d 412. The trial court's factual findings are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Almond*, 2015 IL 113817, ¶ 55, 32 N.E.3d 535. We review *de novo* the trial court's ruling on the suppression of the evidence. *Almond*, 2015 IL 113817, ¶ 55.

¶ 25        The State has the burden of proving the defendant gave consent and that it was voluntary. *People v. Anthony*, 198 Ill. 2d 194, 202, 761 N.E.2d 1188, 1192 (2001); see also *People v. White*, 117 Ill. 2d 194, 221, 512 N.E.2d 677, 687 (1987) (stating the voluntariness of the consent

is a question of fact determined from the totality of the circumstances and the State bears the burden of proving the consent was truly voluntary). Because the voluntariness of consent is a factual question, we will uphold the trial court's finding of voluntariness unless the finding is manifestly erroneous. *People v. Harrell*, 226 Ill. App. 3d 866, 872, 589 N.E.2d 943, 947 (1992). "Manifest error" means error that is "clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85, 686 N.E.2d 574, 582 (1997). "A defendant's consent is invalid unless it is voluntary, and, to be voluntary, consent must be given freely without duress or coercion (either express or implied)." (Internal quotation marks omitted.) *People v. Terry*, 379 Ill. App. 3d 288, 296, 883 N.E.2d 716, 723 (2008). "Consent must be received, not extracted 'by explicit or implicit means, by implied threat or covert force.' " *Anthony*, 198 Ill. 2d at 202 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). In *Terry*, we explained how the circumstances surrounding the consent given must be examined to determine if it was coerced or if, where nonverbal consent is claimed, the defendant's actions were intended as consent as opposed to "mere acquiescence to apparent authority." (Internal quotation marks omitted.) *Terry*, 379 Ill. App. 3d at 297.

¶ 26                                              1. Anthony

¶ 27            Defendant relies, in part, on *Anthony* to support his claim the trial court erred in denying his motion to suppress because the State failed to establish voluntary consent.

¶ 28            In *Anthony*, as part of a community policing initiative, police stopped the defendant coming out of an apartment complex. *Anthony*, 198 Ill. 2d at 197. After a brief conversation about his presence in the neighborhood, the officer testified that the defendant "was nervous," "his hands were shaking," and he kept putting his hands in his pockets and pulling them out. *Anthony*, 198 Ill. 2d at 198. Once the defendant confirmed he had no weapons on him, the officer requested permission to search him. The defendant did not give verbal consent but spread his legs apart and

put his hands on top of his head, as if assuming "the position" to be searched. Police searched him and found cocaine in his pocket. The officer applied no force and never threatened him with a weapon. *Anthony*, 198 Ill. 2d at 198-99. The trial court granted the defendant's motion to suppress based on a lack of probable cause. *Anthony*, 198 Ill. 2d at 199.

¶ 29 On appeal, we reversed the trial court's ruling, based not only on the nature of the stop but also because defendant consented to the search by spreading his legs, putting his hands on his head, and never protesting. See *People v. Anthony*, No. 4-99-0708 (2000) (unpublished order under Illinois Supreme Court Rule 23). In reversing our judgment, the supreme court discussed the applicable law surrounding a voluntary warrantless search and found "a search conducted with a defendant's voluntary consent but without a warrant does not violate the fourth amendment." *Anthony*, 198 Ill. 2d at 202 (citing *Bustamonte*, 412 U.S. at 222). "The validity of a consent search depends on the voluntariness of the consent." *Anthony*, 198 Ill. 2d at 202 (citing *People v. Bean*, 84 Ill. 2d 64, 69, 417 N.E.2d 608, 611 (1981)). It further noted a defendant may convey consent to search by nonverbal conduct. *Anthony*, 198 Ill. 2d at 202 (citing *In re M.N.*, 268 Ill. App. 3d 893, 897, 645 N.E.2d 499, 502-03 (1994), and *People v. Kessler*, 147 Ill. App. 3d 237, 241, 497 N.E.2d 1323, 1325 (1986)). However, as we said later in *Terry*, "mere acquiescence to apparent authority is not necessarily consent." (Internal quotation marks omitted.) *Terry*, 379 Ill. App. 3d at 297; see also *People v. Kelly*, 76 Ill. App. 3d 80, 87 (1979) (stating passive submission to authority is not the voluntary relinquishment of a constitutional right); *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding the prosecution's burden to prove consent was voluntary "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); *Anthony*, 198 Ill. 2d at 202.

¶ 30    The *Anthony* court concluded, "In the case of nonverbal conduct, where dueling inferences so easily arise from a single ambiguous gesture, the defendant's intention to surrender this valuable constitutional right should be *unmistakably clear*." (Emphasis added.) *Anthony*, 198 Ill. 2d at 203. It found defendant's "ambiguous gesture" could be nothing more than submission to authority, which does not constitute voluntary consent. *Anthony*, 198 Ill. 2d at 203-04.

¶ 31                2. *Post-*Anthony *Cases* (Raibley *and* Terry)

¶ 32    We analyzed *Anthony* for the issue of nonverbal consent in both *People v. Raibley*, 338 Ill. App. 3d 692, 788 N.E.2d 1221 (2003), and *Terry*, referenced above.

¶ 33    In *Raibley*, we found favor with the supreme court's holding in *Anthony* that acquiescence to a police search, coupled with an ambiguous gesture, did not constitute voluntary consent, as it "was not defendant's responsibility to protest an illegal search or seizure; it was the police's responsibility to refrain from a search or seizure until defendant gave his clear, voluntary consent." *Raibley*, 338 Ill. App. 3d at 702-03.

¶ 34    In *Raibley*, we found the defendant's "shrug" when police asked if they could search his truck did not constitute voluntary consent because his consent had to be " 'unmistakably clear' " from any " 'nonverbal conduct.' " *Raibley*, 338 Ill. App. 3d at 701 (quoting *Anthony*, 198 Ill. 2d at 203).

¶ 35    In *Terry*, mentioned above, we found the defendant consented as the result of a series of actions consisting of more than merely "assuming the position." After the police asked the defendant if police could search him, the defendant placed his hands on the truck and spread his legs apart. The officer then asked again if he could search the defendant, to which he responded, "You got to go ahead and do what you got to do." When the officer inquired once more, "Does that mean I can search you[?]" the defendant said, "[H]ere[,] let me help you out" and began

removing items from his coat and placing them on top of the truck. (Internal quotation marks omitted.) *Terry*, 379 Ill. App. 3d at 297. It was only then the officer began his search. Based on this set of facts, we found the defendant's conduct was "not merely a shrug" or "an ambiguous assumption of the position" like *Raibley* and *Anthony*. Rather, the defendant voluntarily consented to the search based on the totality of his words and conduct. *Terry*, 379 Ill. App. 3d at 297-98.

¶ 36 The case before us is unlike *Terry*, and more like *Anthony* and *Raibley*. The only evidence of defendant's "voluntary" consent was when Trooper Chapman asked if he could search defendant and, according to Chapman, defendant "did not tell me no." It is noteworthy that, after telling the prosecutor he asked defendant for consent to search his person again, when the State asked, "And what was his response?" Chapman merely responded, "He did not tell me no," which is not actually responsive to the question. What *did* he say? Although the video has no audio, we are asked to glean from gestures and body language whether defendant gave his consent to a search of his person, but the burden is not his. Remember, "where dueling inferences so easily arise from a single ambiguous gesture, the defendant's intention to surrender this valuable constitutional right should be *unmistakably clear*." (Emphasis added.) *Anthony*, 198 Ill. 2d at 203.

¶ 37 Defendant testified that he said "no," that he had already been patted down once, nothing was found, and he wanted to know if he could leave. Instead, on the video, we see defendant being instructed to turn and doing so, placing his hands behind his back as if to be handcuffed. At best, this exhibits his submission to authority. By this time, defendant had been standing outside the car for some length of time, between at least two officers, with more arriving throughout the stop, so that by the time of the search he had "five or six" officers around him, along with a K-9. There is nothing in this record, taking the evidence in the light most favorable to the State, to reveal what, if anything, defendant did to prompt the trooper to believe defendant

provided voluntary consent. *Anthony* and later cases hold that voluntary consent does not require a defendant to protest the search, and any nonverbal consent must be unmistakably clear. See *Raibley*, 338 Ill. App. 3d at 701 (citing *Anthony*, 198 Ill. 2d at 203); see also *People v. Hayes*, 2018 IL App (5th) 140223, ¶ 34, 121 N.E.3d 103.

¶ 38 Even if we disregard defendant's claim he told them "no" when asked if he could be searched again and find the trial court did not err in finding Trooper Chapman credible, the only indication in the record defendant consented to a warrantless search of his person was defendant's lack of protest. As *Anthony* and *Raibley* provide, acquiescence to authority does not equate to consent. Further, nonverbal consent must be *unequivocally* clear, especially where consent is sought to be shown by way of a single ambiguous gesture. Here, "he did not say no" is just such a gesture. The trial court's finding of voluntary consent was manifestly erroneous because it was "clearly evident, plain, and indisputable" that the State failed to meet its burden to show, by the totality of the circumstances, that defendant voluntarily consented to the search of his person. *Ruiz*, 177 Ill. 2d at 384-85.

¶ 39 Since it was the State's burden to demonstrate it obtained voluntary consent, its failure to do so requires us to reverse the trial court's ruling denying defendant's motion to suppress and remand for further proceedings. Based on our ruling, we decline to address the other issues raised by defendant.

¶ 40 III. CONCLUSION

¶ 41 For the reasons stated, we reverse the trial court's judgment and remand this cause for further proceedings consistent with this order.

¶ 42 Reversed and remanded.

**No. 4-18-0761**

| | |
|---|---|
| **Cite as:** | *People v. Banta*, 2021 IL App (4th) 180761 |
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 17-CF-716; the Hon. Leslie J. Graves, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Bryan JW McIntyre, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Benjamin M. Sardinas, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |